## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 02 2019, 8:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennie Scott
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of G.C. (Minor Child); <br><br> B.W. (Father), <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | July 2, 2019 <br><br> Court of Appeals Case No. 19A-JT-83 <br><br> Appeal from the Delaware Circuit Court <br><br> The Honorable Kimberly S. Dowling, Judge <br><br> The Honorable Amanda L. Yonally, Magistrate <br><br> Trial Court Cause No. 18C02-1807-JT-66 |

**Najam, Judge.**

## Statement of the Case

B.W. ("Father") appeals the trial court's termination of his parental rights over his minor child G.C. ("Child"). Father presents a single issue for our review, namely, whether the Indiana Department of Child Services ("DCS") presented sufficient evidence to support the termination of his parental rights. We affirm.

## Facts and Procedural History

K.C. ("Mother"), now deceased, was the mother of Child, who was born January 22, 2014. On January 22, 2017, DCS was notified that, while Child was in Mother's care, Mother had overdosed on heroin and was hospitalized. Father was incarcerated in Ohio at the time. DCS removed Child from Mother's care and placed her with her maternal grandparents.

On January 24, DCS filed a petition alleging that Child was a child in need of services ("CHINS"). On January 28, Mother died. On April 3, the trial court found Child to be a CHINS. Following a hearing, the trial court entered a dispositional decree, whereby the court ordered Father to maintain contact with the family case manager ("FCM"), to "enroll and complete any program recommended by the [FCM] that is available to him in prison," and to provide certificates of completion of those programs. Appellant's App. Vol. 2 at 75.

On July 13, 2018, DCS filed a petition to terminate Father's parental rights over Child. Following a hearing, with Father appearing from prison by telephone, the trial court granted the termination petition. In support of its order, the trial court entered the following findings and conclusions:

10. Due to Father's incarceration in the State of Ohio, the DCS was unable to make services available to him. Father was ordered to participate in services available to him while he is incarcerated.

11. The child has remained in her current placement since the date of her removal on January 22, 2017.

12. The court's Order Approving Permanency Plan from the January 8, 2018, hearing approved a permanency plan of adoption for the child with a concurrent plan of guardianship.

13. Father appeared at the January 8, 2018, permanency hearing via telephone. Father did not appear for the periodic case review hearing on July 9, 2018.

14. Father has remained incarcerated in the State of Ohio throughout the [CHINS] cause and continues to be incarcerated at the North Central Correctional Complex.

15. Sona Lee was the DCS [FCM] assigned to this case from January 30, 2017, through May 1, 2018.

16. Ms. Lee had direct contact with Father on two occasions related to progress reports for the child or to discuss upcoming court hearings.

17. Father was provided with copies of all progress reports via U.S. Mail.

18. Ms. Lee also sent e-mail to Father's case manager at the correctional facility.

19. Father initiated no contact with Ms. Lee and sent no communication (letters, drawings, etc.) to be sent to or shared with the child.

20. Ms. Lee received no evidence that Father had participated in services available to him via the Ohio Department of Correction.

21. Ms. Lee facilitated DNA testing to confirm the child's paternity with Father; Father has taken no steps to legally establish paternity of the child.[1]

22. Alayna Collins is the DCS Family Case Manager currently assigned to the child's case and has been the FCM since May 2018.

23. Ms. Collins met with the Father via telephone on June 28, 2018, August 23, 2018, and November 5, 2018. Ms. Collins updated Father on the child's condition and the case progress.

24. Ms. Collins also sent progress reports and two letters to Father.

25. The first letter sent by Ms. Collins to Father notified him of her contact information. The second letter requested any certificates or other evidence of programs that he completed through the Ohio Department of Correction.

26. Father initiated no contact with Ms. Collins and provided no certificates of programs completed, letters or other communication for DCS or for the child.

27. Father testified that he has completed a program for cognitive thinking and is currently on a waitlist for other programs, including Inside Out Dads.

28. Father has had no contact with the child since her removal on January 22, 2017.

---

[1] DCS conducted a paternity test, which showed that Father is Child's biological father.

29. [N.C.] is the maternal grandmother of the child and has been placement for the child since January 22, 2017.

30. [N.C.] and her husband have temporary custody of Mother's other two children, who are the child's half-brothers.

31. [N.C.] has received no communication from the Father since the child has been placed in her home.

32. The child does not know who her father is.

33. Father participated in parenting the child for approximately three (3) months when she was approximately six (6) months old in 2014. This is the only contact he has had with the child since her birth.

34. Father was incarcerated on September 1, 2015, and admitted to the Ohio Department of Correction on November 17, 2015, following multiple convictions involving possession of drugs and possession of heroin.

35. Father received a sentence of 5 years and 10 months.

36. The Father's earliest possible release date is either June 2, 2020 (according to Father) or February 2, 2021 (according to the Certification of Incarceration from the Bureau of Records Management, Ohio Department of Rehabilitation and Correction) and because he is serving mandatory time, he has no possibility of release prior to that date.

* * *

38. Father was incarcerated at the time of the child's removal, remained incarcerated throughout the [CHINS] case, and will remain incarcerated until at least June 2, 2020, or February 2, 2021.

39.  Father did not provide adequate housing, stability or supervision for the child prior to his incarceration in September 2015, and he is currently unable to meet his responsibilities as a parent due to his incarceration. . . .

40.  Based on father's habitual patterns of conduct that resulted in his incarceration and his lack of involvement in the child's life prior to his incarceration, there is a substantial probability of future neglect if the petition for termination of parental rights is not granted.

41.  Father is in no position to provide care for the child, and it is quite unreasonable to require the child to wait for Father to demonstrate an ability to meet her needs upon his release from incarceration.

42.  The child is in a pre-adoptive home and has resided there for approximately two (2) years.

43.  That the child needs a safe, stable, secure and permanent environment in order to thrive.  The child's Father has not shown the inclination or the ability to provide the child with such an environment.

44.  That the Court Appointed Special Advocate agrees that it is in the best interest of the child to terminate the Father's parental rights.

* * *

46.  That based on the foregoing, there is a reasonable probability that the conditions that resulted in the child's removal and/or continued placement outside the home will not be remedied.

47.  Termination of the parent-child relationship is in the best interest of the child.

48. The Indiana DCS has a satisfactory plan for the care and treatment of the child, which includes adoption.

49. The Indiana DCS has proven its petition herein by clear and convincing evidence.

IT IS ORDERED that the parent/child relationship between [Father and Child is] hereby terminated together with all rights and privileges contained therein.

Appellant's App. Vol. 3 at 38-41. This appeal ensued.

## Discussion and Decision

### *Standard of Review*

We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[6] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
>> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> \* \* \*
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2018).  DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[7] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*.  Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment.  *Id.*  Moreover, in deference to the trial

court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[8] Here, in terminating Father's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[9] On appeal, Father contends that the trial court erred when it concluded that: (1) the conditions that resulted in Child's removal and the reasons for her placement outside of his home will not be remedied; (2) termination is in Child's best interests; and (3) there is a satisfactory plan for the care and treatment of Child.[2] We address each contention in turn.

---

[2] Father also contends that the trial court erred when it concluded that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of Child. However, the trial court made no such conclusion.

### *Reasons for Child's Placement Outside of Father's Home*

[10] Father asserts that DCS "has not proven that [he] is unable to care for [Child] upon his release" from prison. Appellant's Br. at 21. He maintains that "incarceration is an insufficient basis for terminating parental rights" and his "situation will be remedied when he is released from incarceration" in June 2020. *Id.* at 19-20. Father's argument misses the mark.

[11] This court has clarified that, given the wording of the statute, it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also any basis resulting in the continued placement outside of a parent's home. *Inkenhaus v. Vanderburgh Cty. Off. of Fam. & Child. (In re A.I.)*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Here, the trial court properly considered the conditions leading to the continued placement outside of Father's home, including Father's incarceration. Father does not challenge the trial court's findings underlying its conclusion on this issue.

[12] And the evidence supports the trial court's findings and conclusion. To determine whether there is a reasonable probability that the reasons for Child's continued placement outside of Father's home will not be remedied, the trial court should judge Father's fitness to care for Child at the time of the termination hearing, taking into consideration evidence of changed conditions. *See E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the

child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[13] The trial court found, and the evidence supports, that: Father's only contact with Child during her life was during approximately three months in 2014, when Child was a baby; Father has been incarcerated since September 1, 2015, and he has an expected out date of either June 2, 2020 (according to Father) or February 2, 2021 (according to the Ohio Department of Rehabilitation and Correction); Child does not know who her father is; Father has not taken steps to establish his paternity of Child; Father never attempted to contact or communicate with Child during the CHINS proceedings; and Father never provided DCS with certificates to show completion of any services. The trial court also found that "Father is in no position to provide care for the child, and it is quite unreasonable to require the child to wait for Father to demonstrate an ability to meet her needs upon his release from incarceration." Appellant's App. Vol. 2 at 51.

[14] Father attempts to analogize the facts and circumstances of the termination of his parental rights with those in other cases, such as *J.E. v. Indiana Department of Child Services (In re K.E.)*, where our Supreme Court reversed the termination of

an incarcerated Father's parental rights over his child. 39 N.E.3d 641, 652 (Ind. 2015). But in *In re K.E.* and the other cases cited by Father, the incarcerated parents had relationships with their children and maintained contact throughout their incarceration.[3] In contrast, again, Child does not even know who her father is, and Father has never attempted any communication with Child during the CHINS proceedings. Father's argument on appeal is simply an invitation for this Court to reweigh the evidence and judge the credibility of the witnesses, which we cannot do. Based on the totality of the circumstances, we hold that the trial court's findings support its conclusion that the conditions that resulted in Child's removal and the reasons for her placement outside of his home will not be remedied.

### *Best Interests*

[15] Father also contends that the trial court erred when it concluded that termination of his parental rights is in Child's best interests. In determining what is in a child's best interests, a juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *A.S. v. Ind. Dep't of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010). A parent's historical inability to provide "adequate housing, stability, and

---

[3] In *In re K.E.*, for example, the father made "nightly phone calls" to his child while incarcerated. 39 N.E.3d at 651.

supervision," in addition to the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *Id*.

[16] When making its decision, the court must subordinate the interests of the parents to those of the child. *See Stewart v. Ind. Dep't of Child Servs. (In re J.S.)*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *Id*. Moreover, this Court has previously held that recommendations of the family case manager and court-appointed advocate to terminate parental rights, coupled with evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id*.

[17] Here, as the trial court's findings demonstrate, Father has not shown that he is capable of parenting Child. Father's *only* contact with Child was during a three-month period when Child was a baby. Perhaps most telling is Father's unwillingness to establish and maintain any contact with Child since that time. Child has lived with her grandparents and half-brothers since 2017, when she was three years old. The CASA recommended termination of Father's parental rights. Given the totality of the evidence, Father cannot show that the trial court erred when it concluded that termination of his rights was in Child's best interests.

## *Satisfactory Plan*

Finally, Father contends that the trial court clearly erred when it concluded that DCS had a satisfactory plan for the care and treatment of Child. Indiana courts have traditionally held that for a plan to be satisfactory, for the purposes of the termination statute, it need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *K.W. v. Ind. Dep't of Child Servs. (In re A.S.)*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (citation omitted), *trans. denied*. A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children. *Id.* Here, DCS presented evidence that Child's maternal grandparents, with whom she has lived since January 2017, plan to adopt her. The trial court did not err when it concluded that DCS' plan of adoption was satisfactory.

In sum, we affirm the trial court's termination of Father's parental rights over Child.

Affirmed.

Baker, J., and Robb, J., concur.